**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOSHUA MAZER, individually and on behalf of
his minor child,

                    Plaintiff,

    -against-

THE DISTRICT OF COLUMBIA
DEPARTMENT OF HEALTH, LAQUANDRA S.
NESBITT, in her official capacity as Director of
the District of Columbia Department of Health,
and MURIEL BOWSER, in her official capacity as
Mayor of the District of Columbia,

                    Defendants.

CASE NO. 1:21-cv-01782-TNM

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS**
**MOTION FOR A PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION .............................................................................................................. 1

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ................................................................................................................ 4

I.   The National Childhood Vaccine Injury Act of 1986 and Its Requirement to Provide a
     "Vaccine Information Statement" ............................................................................ 4

     a.   Prior to the 1986 Federal Act, Vaccine Companies Faced Enormous Liability for
          Vaccine Injuries .............................................................................................. 4

     b.   The 1986 Federal Act's Safeguards with Regard to Administering
          Vaccines to Children ....................................................................................... 5

     c.   Importance of Providing the VIS to the Parent ............................................. 7

     d.   Vaccinations are Capable of Causing Harm ................................................. 9

II.  The 2020 DC Law Permits Vaccination of a Child without Parental Consent ............... 13

III. A Physician in the District of Columbia Sought to Vaccinate Plaintiff's Child Without
     His Consent ........................................................................................................... 15

IV.  Plaintiff is Extremely Concerned about his Daughter .................................................. 17

ARGUMENT ..................................................................................................................... 19

I.   LIKELIHOOD OF SUCCESS ON THE MERITS ..................................................... 19

     A.   The 2020 DC Law is Preempted by the 1986 Federal Act .......................... 19

     B.   Plaintiff states Valid Section 1983 Claims Pursuant to the 5th Amendment ............. 21

          1.   Deprivation of Plaintiff's Rights and Privileges Under the
               1986 Federal Act .................................................................................. 21

          2.   Plaintiff has a Fundamental Liberty Interest in the Right to Parent, including
               Participating In and Making Medical Decisions on Behalf of his Children ........ 23

          3.   The 2020 DC Law Violates Plaintiff's Procedural
               Due Process Rights ............................................................................... 24

          4.   The 2020 DC Law Violates Plaintiff's Substantive
               Due Process Rights ............................................................................... 27

          5.   The 2020 DC Law Violates Plaintiff's Sincerely Held Religious Beliefs

            Pursuant to RFRA and the First Amendment ........................................................ 28

II.     IRREPARABLE HARM ........................................................................................ 30

III.    BALANCE OF THE EQUITIES AND PUBLIC INTEREST .................................. 32

CONCLUSION......................................................................................................................... 33

TABLE OF AUTHORITIES

**Cases**

*Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*,
495 F.3d at 702 (D.C. Cir. 2007) ................................................. 27

*Am. Acad. of Pediatrics v. Heckler*,
561 F. Supp. 395 (D.D.C.1983) ................................................. 28

*Bolling v. Sharpe*,
347 U.S. 497 ................................................. 27

*\*Bruesewitz v. Wyeth LLC*,
562 U.S. 223, 227 (2011) ................................................. 4, 5

*\*Capitol Hill Baptist Church v Bowser*,
496 F. Supp. 3d 284, 293 (D.D.C. 2020) ................................................. 28, 30

*\*Costa v. Bazron*,
464 F. Supp. 3d 132, 156 (D.D.C. 2020) ................................................. 32, 33

*Doe v. District of Columbia*,
418 U.S. App. D.C. 96, 103, 796 F.3d 96, 103 (2015) ................................................. 25

*Gordon v. Holder*,
406 U.S. App. D.C. 6, 721 F.3d 638 (2013) ................................................. 33

*In re A.G.*,
900 A.2d 677, 680 (D.C. 2006) ................................................. 24

*\*In re G.K.*,
993 A.2d 558, 568 (D.C. 2010) ................................................. 24, 26

*In re T.J.*,
666 A.2d 1, 11-12 (D.C. 1995) ................................................. 23

*Karem v. Trump*,
447 U.S. App. D.C. 103, 115, 960 F.3d 656, 668 (2020) ................................................. 33

*Kozup v. Georgetown Univ.*,
271 U.S. App. D.C. 182, 851 F.2d 437, 439 (1988) ................................................. 23

*\*M.G.U. v. Nielsen*,
325 F. Supp. 3d 111, 118 (D.D.C. 2018) ................................................. 19, 23, 27

*Mills v. District of Columbia*,
387 U.S. App. D.C. 221, 229, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ........................................ 30

*Parham v. J. R.*,
442 U.S. 584, 602 (1979) .................................................................................................. 23

*Parker v. District of Columbia*,
293 F. Supp. 3d 194, 200 (D.D.C. 2018) ............................................................................ 21

*Pursuing America's Greatness v. FEC*,
831 F.3d 500, 511, 425 U.S. App. D.C. 31 (D.C. Cir. 2016) ..................................................... 32

*\*Santosky v. Kramer*,
455 U.S. 745, 747, (1982) ............................................................................................. 23, 24

*Simms v. District of Columbia*,
872 F. Supp. 2d 90, 94 (D.D.C. 2012) ................................................................................ 19

*Stevens v. Secretary of HHS*,
No. 99-594V (Office of Special Masters 2001) ....................................................................... 9

*Texas Children's Hosp. v. Burwell*,
76 F. Supp. 3d 224, 245 (D.D.C. 2014) .............................................................................. 32

*\*Troxel v. Granville*,
530 U.S. 57, 65-66 (2000) ......................................................................................... 23, 24, 27

*Washington v. Glucksberg*,
521 U.S. 702, 721 (1997) ........................................................................................... 27

**Statutes**

21 C.F.R. § 201.57 .................................................................................................. 11

22-B DCMR § 600 ................................................................................................. 1, 14

*22-B DCMR § 600.9 ........................................................................................ 1, 15, 19

22-B DCMR § 600.9(c) ............................................................................................ 14

42 U.S.C. § 300aa-1 – 34 ........................................................................................... 4

42 U.S.C. § 300aa-11 ............................................................................................... 5

42 U.S.C. § 300aa-12 ............................................................................................ 7, 9

42 U.S.C. § 300aa-13 ...........................................................................................................9

42 U.S.C. § 300aa-16 .......................................................................................................... 8

*42 U.S.C. §§ 300aa-25 – 28 ....................................................................... 5, 6, 19, 20

*42 U.S.C. § 300aa-26 ............................................................................................. 19, 20

42 U.S.C. § 300aa-26(a) ...................................................................................................6

42 U.S.C. § 300aa-26(c) ...................................................................................................6

42 U.S.C. § 300aa-26(d) ...................................................................................................6

42 U.S.C. § 300aa-33 ........................................................................................................6

42 U.S.C. § 1983........................................................................................... 19, 20, 21

42 U.S.C. § 2000bb–1 .................................................................................................... 28

42 U.S.C. § 2000bb–2.................................................................................................... 28

**Other Authorities**

John E. Bennett, Raphael Dolin, and Martin J. Blaser. *Mandell, Douglas, and Bennett's Principles and Practice of Infectious Diseases*. Eighth edition. Philadelphia, PA: Elsevier/Saunders; 2015,
https://www.ncbi.nlm.nih.gov/nlmcatalog/101633437........................................................9

Bruce Carlson. *Vaccine Market Tops 37 Billion, Says Kalorama Information Report*, PRWeb; November 11, 2020,
https://tinyurl.com/3x3k977r .......................................................................................... 5

Centers for Disease Control and Prevention, Vaccine Information Statements (VISs), Tdap VIS,
https://www.cdc.gov/vaccines/hcp/vis/vis-statements/tdap.html ................................ 18

Committee on Government Reform, *The Vaccine Injury Compensation Program: Addressing Needs and Improving Practices, Sixth Report,* 106th Congress, 2d Session - House Report 106-977; 2000,
https://www.congress.gov/106/crpt/hrpt977/CRPT-106hrpt977.pdf............................. 7

IOM, *Adverse Events Associated with Childhood Vaccines*, (1994) at 2 ...................... 5

"Minor Consent for Vaccinations Amendment Act of 2020," codified at subsection 600.9 of title 22-B § 600 of the Code of D.C. Municipal Regulations,
https://code.dccouncil.us/dc/council/laws/23-193.html....................................... 1, 15

National Research Council (US) Division of Health Promotion and Disease Prevention. Vaccine Supply and Innovation. Washington (DC): National Academies Press (US); 1985. 4, *Economic Aspects of Vaccine Innovation and Manufacturing*, https://www.ncbi.nlm.nih.gov/books/NBK216815/ ...................................................................... 5

Tom T. Shimabukuro, MD, MPH, MBA, Michael Nguyen, MD, David Martin, MD, MPH and Frank DeStefano, MD, MPH, *Safety monitoring in the Vaccine Adverse Event Reporting System (VAERS)*; Centers for Disease Control and Prevention (U.S); July 22, 2015, https://stacks.cdc.gov/view/cdc/36403 ....................................................................................... 12

U.S. Food & Drug Administration, Vaccines Licensed for Use in the United States, https://www.fda.gov/vaccines-blood-biologics/vaccines/vaccines-licensed-use-united-states .... 12

United States Court of Federal Claims, USCFC Vaccine-Reported https://uscfc.uscourts.gov/aggregator/sources/7 .......................................................................... 11

United States Government Accountability Office, Report to the Chairman, Committee on Oversight and Government Reform, House of Representatives, *Vaccine Injury Compensation, Most Claims Took Multiple Years and Many Were Settled through Negotiation*; 2014, http://www.gao.gov/assets/670/667136.pdf ........................................................................................ 9

## INTRODUCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and LCvR 65.1(c), plaintiff in the above captioned case, by and through his attorneys, hereby moves for a Preliminary Injunction enjoining the defendants the District of Columbia Department of Health ("**CDPH**"), Laquandra S. Nesbitt, in her official capacity as the Director of the CDPH, and Muriel Bowser, in her official capacity as the Mayor of the District of Columbia (collectively, "**Defendants**"), from implementing and enforcing the 2020 D.C. Law "Minor Consent for Vaccinations Amendment Act of 2020," codified at subsection 600.9 of title 22-B § 600 of the Code of D.C. Municipal Regulations[1] (the "**2020 DC Law**") which permits a child, eleven years of age of older, to receive a vaccine without the child's parents' consent or knowledge.

## PRELIMINARY STATEMENT

The National Childhood Vaccine Injury Act of 1986 (the "**1986 Federal Act**") creates a detailed federal statutory scheme for childhood vaccines, including granting pharmaceutical companies immunity for injuries caused by childhood vaccines and counterbalancing that protection for companies by adding safety related requirements for administering childhood vaccines.

In that regard, the 1986 Federal Act requires that a health care provider that intends to administer a childhood vaccine must provide the parent[2] a vaccine information statement ("**VIS**") prepared by the United States Department of Health and Human Services ("**HHS**"). The VIS provides the parent with critical information regarding the vaccine, including information about the importance of the vaccine, information regarding the risks of a vaccine reaction, and advice to

---

[1] https://code.dccouncil.us/dc/council/laws/23-193.html.

[2] Hereinafter, "parent" shall mean biological parent, legal parent, or guardian.

parents on when a child should not receive the vaccine.  It also advises the parent to inform the doctor if the child has any of the listed risk conditions.  The VIS further informs the parent of the Vaccine Injury Compensation Program, the federal program created to compensate people who may have been injured by certain vaccines.

Ignoring these and other requirements of this federal statutory scheme for administering childhood vaccines, the Council of the District of Columbia (the "**D.C. Council**") recently enacted a law that directly conflicts with these federal requirements, the "**2020 DC Law**.  The 2020 DC Law permits a health care provider to administer vaccines to a child as young as eleven years of age without any parental consent or knowledge and without first providing the parent a VIS.  The 2020 DC Law, in fact, creates an entire structure by which the health care provider, insurance company, school, and health department all engage in an elaborate and deceitful scheme, including lying to the parents, to hide from those parents the fact that their child was vaccinated.

The 2020 DC Law is not only preempted by the 1986 Federal Law, it also violates the entrenched and fundamental constitutional right to parent, including the right of a parent to make medical decisions on behalf of one's children. It is well settled law that parents are not to be deprived of the care, custody, or management of their children without their consent or due process of law.  The 2020 DC Law tramples on a parent's rights without ever requiring a finding that the parent is unfit to make medical decisions for his or her children.

In this case, Plaintiff's daughter, J.D.,[3] suffered a severe reaction to a tetanus, diphtheria, and pertussis vaccine when she was five years of age.  Immediately after these vaccinations, J.D., required urgent medical treatment, including a multi-day oral steroid pack to reduce the swelling

---

[3] The initials "J.D." stand for Jane Doe and are used for the purposes of the anonymity of Plaintiff's minor child.

and inflammation and to assist with the severe pain she was experiencing.   The current VIS for the vaccine J.D. received when she was five years old clearly tells a parent to "[t]ell your vaccine provider if the person getting the vaccine … had an **allergic reaction after a previous dose of any vaccine that protects against tetanus, diphtheria, or pertussis** … or had **severe pain or swelling after a previous dose of any vaccine that protects against tetanus or diphtheria**." (emphasis in original.)  These are the precise reactions that J.D. suffered after J.D.'s receipt of this vaccine at five years of age and the VIS informs a parent to make sure to inform any medical provider seeking to administer this vaccine about this prior reaction.

J.D. is a child and recently visited a doctor's office in the District of Columbia without her parents.   J.D. requested to receive a vaccine which was a tetanus, diphtheria, and pertussis-containing vaccine.   The medical office confirmed that her parents were not aware she was requesting this vaccination, never asked J.D. about her medical history or any prior reactions to a vaccine, upsold her to also receive two other shots as well (Gardasil and MenACWY), never provided her with a VIS or any literature regarding the vaccines, praised her for deceiving her parents, coached her about how to lie so the medial office can illegally obtain federal payment for the vaccines and when J.D. at the last minute changed her mind about receiving the vaccines, physically positioned themselves around J.D. such that J.D. felt like she was trapped and unable to leave the medical office.  J.D. eventually left without receiving the vaccines at that appointment but was provided with instructions on how to receive them, without the risk of her parents finding out, when she returned.

For the reasons detailed below, Plaintiff respectfully moves this Court for a preliminary injunction to enjoin Defendants, their agents, officers, employees, successors, and all persons

acting in concert with each or any of them from implementing, enforcing, or giving any effect to the 2020 DC Law for the pendency of this action or until further order of the Court.

## BACKGROUND

I.   <u>The National Childhood Vaccine Injury Act of 1986 and Its Requirement to Provide a "Vaccine Information Statement"</u>

Unlike nearly every other company selling a consumer product, pharmaceutical companies are not liable for injuries caused by their vaccines.  The 1986 Federal Act (42 U.S.C. §§ 300aa-1 - 300aa-34) grants pharmaceutical companies immunity from financial liability for injuries caused by their vaccine products and instead places the responsibility for vaccine safety in the hands of the Secretary of the HHS (the "**Secretary**").  Recognizing that by providing such immunity it eliminated an important incentive for pharmaceutical companies to assure the safety of their vaccine products, Congress created various safeguards regarding the use of vaccines.  Among these safeguards is the requirement that every parent receive a VIS prior to their child being vaccinated to ensure the parent receives critical information regarding the vaccine, including information to help determine whether their child should not receive the vaccine.

a.   **Prior to the 1986 Federal Act, Vaccine Companies Faced Enormous Liability for Vaccine Injuries**

In 1986, there were just two vaccines the Centers for Disease Control and Prevention ("**CDC**") recommended injecting into children, DTP and MMR, and due to crippling financial liability from injuries caused by these vaccines, only one manufacturer remained for each vaccine. As explained by the United States Supreme Court, "by the mid-1980's … the remaining manufacturer [of DTP] estimated that its potential tort liability exceeded its annual sales by a factor of 200." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 227 (2011).  Hence, as explained by the Institute of Medicine, by 1986 the "litigation costs associated with claims of damage from vaccines had forced several companies to … stop producing already licensed vaccines" and the remaining

4

pharmaceutical companies producing vaccines threatened to withdraw from the vaccine market. IOM, *Adverse Events Associated with Childhood Vaccines*, (1994) at 2.

Instead of permitting market forces to drive pharmaceutical companies to develop safer vaccines – as occurs with drugs and almost all other consumer products – Congress passed the 1986 Federal Act, which virtually eliminated economic liability for pharmaceutical companies for injuries caused by their vaccine products. *See* 42 U.S.C. § 300aa-11 ("No person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death."); *Bruesewitz v. Wyeth LLC*, 562 U.S. at 223 ("we hold that the National Childhood Vaccine Injury Act preempts all design-defect claims against vaccine manufacturers brought by plaintiffs who seek compensation for injury or death caused by vaccine side effects").

From 1986 to present, the CDC's childhood vaccine schedule has grown from injecting just 2 vaccines to the current 14 vaccines (HepB, DTaP, Hib, PCV13, IPV, IIV, MMR, VAR, HepA, Tdap, HPV, MenACWY, MenB, and PPSV23) and soon the CDC will likely add the COVID-19 vaccine. During that time, with a liability-free, captive market of millions of children required to receive these vaccines by law, vaccine sales have similarly grown from a market worth just a few hundred million dollars around 1986 to a market worth over $37 billion in 2020.[4]

### b. The 1986 Federal Act's Safeguards with Regard to Administering Vaccines to Children

By granting pharmaceutical companies financial immunity for injuries, Congress sought to improve vaccine safety by including in the 1986 Federal Act a subsection entitled "Assuring A Safer Childhood Vaccination Program In The United States" codified at 42 U.S.C. §§ 300aa-25 –

---

[4] https://www.ncbi.nlm.nih.gov/books/NBK216815/; *see also* https://tinyurl.com/3x3k977r.

300aa-28.  That sub-section provides, among other things, that the Secretary shall create a VIS for each childhood vaccine that is to be provided to the parent of the child receiving the vaccine.  *See* 42 U.S.C. § 300aa-26(a) (The Secretary is required to "develop and disseminate vaccine information materials for distribution by health care providers to the legal representatives of any child or to any other individual receiving a vaccine set forth in the Vaccine Injury Table.")

The content of each VIS must include information about the benefits and risks of the vaccine, information about the National Vaccine Injury Compensation Program, and other relevant information as determined by the Secretary.  *See* 42 U.S.C. § 300aa-26(c) ("The information in such materials shall be based on available data and information, shall be presented in understandable terms and shall include – (1) a concise description of the benefits of the vaccine, (2) a concise description of the risks associated with the vaccine, (3) a statement of the availability of the National Vaccine Injury Compensation Program, and (4) such other relevant information as may be determined by the Secretary.")

In response, the Secretary has developed a VIS for each vaccine on the CDC's childhood vaccination schedule.  *See* Ex. A[5] (copies of the VIS for DTaP, HepB, HepA, HPV, IIV, MMR, MMRV, MenACWY, MenB, Tdap, and VAR vaccines).

The 1986 Federal Act is unequivocal that the health care provider who administers the vaccine must provide the VIS to the parent before administering the vaccine to any child.  As provided in 42 U.S.C. § 300aa-26(d):

> each health care provider who administers a vaccine set forth in the Vaccine Injury Table shall provide to the legal representatives of any child or to any other individual to whom such provider intends to administer such vaccine a copy of the [VIS] … supplemented with visual presentations or oral explanations, in appropriate cases. Such

---

[5] All exhibits referenced herein are attached to the declaration of attorney Elizabeth A. Brehm filed concurrently herewith.

materials shall be provided prior to the administration of such vaccine. For the purposes of this section: "The term 'legal representative' means a parent or an individual who qualifies as a legal guardian under State law." 42 U.S.C. § 300aa-33. Thus, under federal law, a medical practitioner *must* provide the VIS with appropriate supplemental explanations to the legal guardian of a child *prior* to injecting the child with a vaccine.

In another section of the 1986 Federal Act, Congress mandated that any claims for injuries from a childhood vaccine must be made to the National Vaccine Injury Compensation Program ("**VICP**"), which is part of the United States Court of Federal Claims. In the VICP, the Secretary, as the respondent, is legally obligated to defend against any claim of injury and is represented by the formidable resources of the U.S. Department of Justice which vigorously defends against any claim that a vaccine has caused an injury. *See, e.g.,* https://www.congress.gov/106/crpt/hrpt977/CRPT-106hrpt977.pdf ("DOJ attorneys make full use of the apparently limitless resources available to them," "pursued aggressive defenses in compensation cases," "establish[ed] a cadre of attorneys specializing in vaccine injury" and "an expert witness program to challenge claims."); 42 U.S.C. § 300aa-12 ("In all proceedings brought by the filing of a petition [in Vaccine Court] the Secretary shall be named as the respondent.")

### c. Importance of Providing the VIS to the Parent

Each VIS typically has seven sections, which provide important and potentially life-saving information for the parent to consider prior to vaccinating their child.

The first section entitled "Why get vaccinated?" provides important information regarding the benefit of receiving the vaccine. Vaccines are considered a crowning achievement of medical science. Their benefits are widely regarded. But not all individuals are aware of their promoted benefits. Providing a VIS to the parent assists in informing the parent of these benefits.

The second section explains who should receive the vaccine and when. The third section makes clear that a parent must "[t]ell your vaccine provider if the person getting the vaccine" meets

one of the listed criteria so that the health care provider will know not to give a vaccine.  For example, the VIS for the Tdap vaccine informs the parent to tell the doctor if the minor has had:

- "an allergic reaction after a previous dose,"

- "a coma, decreased level of consciousness, or prolonged seizures within 7 days after a previous dose,"

- "seizures or another nervous system problem [at any time],"

- "Guillain-Barré Syndrome [at any time]," or

- "severe pain or swelling after a previous dose of any vaccine."

(Ex. A at 22.[6])  Tdap is a pertussis, diphtheria, and tetanus-containing vaccine that is approved for adults and children seven years of age and older, and one dose is recommended by the CDC to be given during the pre-teen or teenage years.  (Ex. B at 2, 8.)  The only other doses of a pertussis, diphtheria, and tetanus containing-vaccine would have been given at 2 months, 4 months, 6 months, 16 months, and 4 years of age.  *Id.*  Hence, a pre-teen or teenage minor would likely not know if he or she experienced any of the above conditions from a prior dose of the vaccine.  This is why it is so important for the parent to receive the VIS prior to their child being vaccinated.

Section four of the VIS details the risks of a vaccine reaction.  Section five advises what to do if a serious problem arises from the vaccination.  Section six explains the existence of the VICP program to compensate people injured by the vaccine.

The VIS references the VICP to ensure that parents are aware of the program and that timely filing a claim in this program is critical.  A child *cannot* file a claim – it *must* be filed by the child's parent– and there is *no* tolling of claims during the period an individual is a minor.  42 U.S.C. § 300aa-16.  Hence, even assuming that the child (i) did not suffer an injury that impacted

---

[6] Pin cites for all exhibits refer to the page number of the substantive exhibit.

his or her judgment, (ii) is aware of the VICP, (iii) is capable of filing a claim and wants to file a claim, and (iv) has the wherewithal to hire an attorney, the child *still* cannot file a claim without his or her parent's participation.

### d.   Vaccinations Are Capable of Causing Harm

The vast majority of health professionals believe the benefits of vaccination far exceed the risks of receiving a vaccine.  But there are still risks.  Indeed, despite the fact that a petitioner must prove causation for nearly all claims of injury,[7] the VICP has awarded compensation for the following injuries from the Tdap, HPV, IIV, and MenACWY vaccines, the four vaccines typically given to teenagers (the "**Teenage Vaccines**"):

> abscess, acute disseminated encephalomyelitis (ADEM), acute liver failure, adhesive capsulitis, aggravation of pre-existing encephalopathy, agoraphobia, anaphylactic shock, anaphylaxis, angioedema, antisynthetase syndrome, angiomatoid fibrous histiocytoma, aplastic anemia, anxiety, aplastic anemia, arm injury, arthritis, ataxia, atypical fibromyalgia, autism, autoimmune hep type 2, autoimmune encephalitis, autoimmune hemolytic anemia, autoimmune limbic encephalitis, autoimmune meningitis, autoimmune neuroretinitis, behavioral issues, bell's palsy, benign tumor, bilateral peripheral neuropathy, bilateral shoulder pain, bilateral symmetric diaphragmatic palsy, blindness, blood clots, bowel obstruction, brachial neuritis, brachial plexopathy, brachial plexus, neuritis, cardiac injury, celiac disease, cellulitis, central nervous system demyelinating disorder, cerebellitis, cerebral vasculitis, cerebellar ataxia, cerebrovascular accident, chest pain, choreiform, movement disorder, chronic fatigue, chronic

---

[7] This was not what Congress intended in passing the 1986 Federal Act.  Instead, the 1986 Federal Act created a Vaccine Injury Table (the "**Table**") which was intended to permit the Vaccine Court to quickly compensate certain common vaccine injuries. 42 U.S.C. § 300aa-12.  If the child suffered an injury on the Table, the burden shifted to HHS to prove the vaccine did not cause the injury.  42 U.S.C. § 300aa-13.  After passage of the 1986 Federal Act, almost 90% of claims were Table claims and quickly settled. *Stevens v. Secretary of HHS*, No. 99-594V (Office of Special Masters 2001). However, in 1995 and 1997, HHS amended the Table such that 98% of claims became off-Table. http://www.gao.gov/assets/670/667136.pdf.  As a result, injured children must now almost always prove "causation" – the biological mechanism by which the vaccine injured the child. https://www.ncbi.nlm.nih.gov/nlmcatalog/101633437 ("Persons alleging a condition not included in the table … must prove that the vaccine was the cause.").

gastrointestinal issues, chronic arthritis, chronic fatigue syndrome, chronic headache, chronic inflammatory demyelinating polyneuropthay (CIDP), chronic pain, chronic urticaria, complex regional pain syndrome, demyelinating disease of central nervous system, conversion disorder, demyelinating polyradiculoneuropathy, death, deltoid bursitis, demyelinating condition, demyelinating sensorimotor polyneuropathy, dermatitis, dermatomyositis, diverticulitis, dravet syndrome, developmental delay, devic's disease, eczema, elevated intraocular pressure, encephalititis, encephalopathy, epilepsy, epstein barr virus, erythema multiforme major, evan's syndrome, exacerbation of existing cardiomyopathy, expressive language delay, fainting injuries, fatigue, febrile seizure, fibromyalgia, fibrosis, frozen shoulder, gastrointestinal symptoms, gastrointestinal issues, gastroparesis, GM1 gangliosidosis, guillain-barre syndrome (GBS), glomerulonephritis, hashimoto's thyroiditis, headaches, hemophagocytic lymphohistiocytosis (HLH), heel pain, henoch-schonlein purpura (HSP), hernia, hip impingement syndrome, hodgkin's lymphoma, hypereosinophilia, hypersensitivity, hyperthyroidism, hypotensive-hyporesponsive shock collapse (HHE), hypoproteinemia, hypotonia, immobile flaccid legs, immune issues, idiopathic intracranial hypertension, immune thrombocytopenia purpa, impingement syndrome, increased risk of cancer, infantile spasms, inflammatory arthritis, inflammatory brachial plexopathy, inflammatory neuropathy, intractable epilepsy, joint pain, juvenile dermatomyositis, joint stiffness, juvenile idiopathic arthritis, juvenile rheumatoid arthritis (JRA), kawasaki disease, keloid scarring, labrum tear, leukocytoclastic vasculitis (LCV), leukodystrophy, leukoencephalopathy, latent herpes simplex virus infection, lichen planus, lipomas, long thoracic nerve palsy, lupus (SLE), lymphangitis, lymphomatoid granulomatosis, macrophagic myofasciitis, meningoencephalitis, metal toxicity, mixed connective tissue disease (MCTD), monoplegia, motor tics, multi organ failure, multiple sclerosis, muscle spasms, muscle weakness, myalgias, myelitis, necrotizing pancreatitis, nerve damage, neurological injury, neuromyelitis optica (NMO), neuropathic arm pain, neuropathy, nodular fasciitis, opsoclonus-myoclonus syndrome (OMS), ocular visual disturbance, optic neuritis, panic, pancreatitis, polyarthralgia pain syndrome, polyarthritis, overlap syndrome, panuveitis, panniculitis, parsonage turner syndrome, pemphigus vulgaris, peripheral neuropathy, permanent spastic tetraparesis, persistent headaches, polyarthralgia, polyneuropathy, post-vaccine encephalopathy, progressive encephalopathy, psoriatic arthritis, pulmonary edema, pyoderma gangrenosum, radial nerve damage, rash, reactivation of herpes simplex virus, reactive inflammatory arthritis, reflex sympathetic

10

dystrophy, residual seizure disorder (RSD), retinal vasculitis, retro seizures, rhabdomyolysis, rheumatoid arthritis, rheumatologic injuries, scaring, scn1a, seizures, seizure disorder, sensory neuropathy, sensory polyneuropathy, serum sickness, SIDS, significant aggravation of pre-existing neurodevelopmental disorder, sirva, small fiber neuropathy, shoulder pain, skin disfigurement, spinal accessory neuropathy, splenic rupture, sjogren's syndrome, snapping hip syndrome, strep infection, stroke, suprascapular neuropathy, sweets syndrome, syncopal seizure, syncope, synovitis, systemic juvenile idiopathic arthritis, tendonitis, tendinopathy, topical epidermal necrolysis, toxic epidermal necrolysis (TEN), toxic shock syndrome, transverse myelitis (TM), thrombocytopenic purpa, tics, tremors, trigeminal neuralgia, ulcerative colitis, urticaria, undifferentiated connective tissue disease (UCTD), ulceration, ulnar neuropathy, urinary incontinence, urticarial angioedema, uveitis, vasculitis, vasovagal syncope, vertigo, vestibular neuronitis[8]

Also, federal law requires that the pharmaceutical company selling the vaccine list on the package insert for each vaccine "*only* those adverse events for which there is some basis to believe there is a *causal* relationship between the drug and the occurrence of the adverse event." 21 C.F.R. § 201.57 (emphasis added.) The package inserts for the four Teenage Vaccines list the following adverse events their manufacturers have a basis to believe have a causal relationship with the vaccines:

abnormal gait, acute disseminated encephalomyelitis, anaphylactic and anaphylactoid reactions, angioedema, arthralgia, arthritis, asthenia, autoimmune diseases including autoimmune hemolytic anemia, back pain, Bell's Palsy, bronchospasm, cellulitis, chest pain, chills, convulsions (with and without fever)(including febrile seizures), death, deep venous thrombosis, diarrhea, difficulty breathing, dizziness, drowsiness, dysphagia, dysphonia, dyspnea, encephalitis, encephalopathy, eosinophilic meningitis, epistaxis, erythema, exacerbation of symptoms of mitochondrial encephalomyopathy (Leigh syndrome), exanthem, extensive swelling of the injected limb, eye pain, facial edema, facial palsy, facial or cranial nerve paralysis, flushing, generalized skin reactions, Guillain-Barré syndrome, Henoch-Schönlein purpura, hypersensitivity, hypoesthesia, hypokinesia, hypotension,

---

[8] *See, e.g.,* https://uscfc.uscourts.gov/aggregator/sources/7.

idiopathic thrombocytopenic purpura, influenza-like illness, injected limb mobility decreased, injection site bruising, injection site ecchymosis, injection site erythema, injection site induration, injection site inflammation, injection site mass, injection site nodule, injection site pruritus, injection site rash, injection site reaction, injection site sterile abscess, injection site warmth, insomnia, irritability, large injection site swelling, laryngitis, limb paralysis, loss of appetite, loss of consciousness, lymphadenitis, lymphadenopathy, malaise, meningitis, motor neuron disease, muscle weakness, musculoskeletal pain and pain in the extremity, myalgia, myocarditis, nausea, neck pain, neuralgia, neuritis, neuropathy, pallor, pancreatitis, paralysis, paresthesia, pericarditis, photophobia, presyncope, pruritus, pulmonary embolus, pyrexia, rash, rhinitis, serum sickness, somnolence, sweating, syncope, throat tightness, thrombocytopenia, transverse myelitis, tremor, upper airway swelling, urticaria, vaccine-associated encephalitis, vasculitis which may be associated with transient renal involvement, vasovagal syncope, vomiting, wheezing[9]

While medical science has not yet established the rate at which most of the above injuries occur, the potential rate may be gleaned from the Vaccine Adverse Events Reporting System ("**VAERS**"), a passive reporting system operated by the CDC and FDA which receives a vast majority of its reports from health care professionals or pharmaceutical companies. *See* https://stacks.cdc.gov/view/cdc/36403.   In the last ten years, for the four Teenage Vaccines, VAERS has received in total reports of at last 1,999 deaths, 6,091 permanent disabilities, and 18,773 hospitalizations.  (Ex. C.)  An HHS-funded, three-year study by Harvard Medical School researchers explained that "fewer than 1% of vaccine adverse events are reported."  (Ex. D at 6.) In fact, recent peer reviewed reports have affirmed that VAERS captures far less than 1% of adverse events.[10]

---

[9] *See* Section 6.2 of the Package Insert for each of the four vaccines *available at* https://www.fda.gov/vaccines-blood-biologics/vaccines/vaccines-licensed-use-united-states.

[10] According to the CDC, "Anaphylaxis after COVID-19 vaccination … occurred in approximately 2 to 5 people per million vaccinated in the United States based on events reported to VAERS." (Ex. E.) In contrast, a recent study at Mass General Brigham that assessed anaphylaxis in a clinical setting after the administration of COVID-19 vaccines found "severe reactions consistent with

Thus, while most health care professionals assert that the benefits of vaccines likely outweigh the risks, the risks are real and must be taken into consideration. This is why the VIS is so important in educating parents regarding the vaccines their child is taking, and in ensuring that if the child has a reaction the parent has some means to draw a connection between the vaccination and the adverse reaction.

## II.   The 2020 D.C. Law Permits Vaccination of a Child Without Parental Consent

Despite the statutory scheme created by the 1986 Federal Act for administering vaccines to children, the D.C. Council recently passed the 2020 DC Law permitting doctors to vaccinate a child as young as eleven years of age without parental consent or knowledge. Nothing in the 2020 DC Law requires the medical provider to give a VIS to the child's parent or to obtain the parent's consent, as required by the 1986 Federal Act. To the contrary, the law specifically prohibits such actions. This law also creates an entire legal regime to deceive the parents by requiring the child, the doctor, the insurance companies, schools, and health department to all lie to the parents about the child's vaccination status. The bill that introduced the 2020 DC Law made this deceit apparent on its face when it summarized the purpose of the law by saying that it would "prohibit an insurer

---

anaphylaxis occurred at a rate of 2.47 per 10,000 vaccinations." (Ex. F at 3.) This is equivalent to 50 times to 120 times more cases than what are reported to VAERS for a condition that occurs almost immediately after vaccination and which vaccine providers are repeatedly advised to report.

Similarly, the CDC expected that 11,440 deaths from long term care facilities ("**LTCF**") would be reported to VAERS given the number of deaths that would naturally occur during the period directly after COVID-19 vaccination in these facilities. (Ex. G at 37.) Instead, VAERS only received 129 reports of deaths following COVID-19 vaccination in LTCF (or 1.1%) for a condition, death, that is easy to identify and which the FDA and CDC have repeatedly reiterated must by law be reported to VAERS. *See, e.g.,* relevant excerpts of Fact Sheet for Healthcare Providers Administering Vaccine for each of the three authorized vaccines available at Ex. H.

If anaphylaxis and death are being underreported, it is not surprising there is even greater underreporting for serious adverse events that do not occur immediately after vaccination or are not easily identified.

from sending an Explanation of Benefits, to allow a minor access to the minor's immunization records; and …to require a physician to submit the immunization record directly to the minor's school if the parent is utilizing a religious exemption or is opting out of receiving the Human Papillomavirus vaccine."

The D.C. Council enacted the 2020 DC Law in December of that year by adding a new subsection 600.9 to 22-B DCMR § 600.  Section "a" of this new subsection states:

> A minor, 11 years of age or older, may consent to receive a vaccine if the minor is capable of meeting the informed consent standard, the vaccine is recommended by the United States Advisory Committee on Immunization Practices ("ACIP"), and will be provided in accordance with ACIP's recommended immunization schedule. *Id.*

Section "b" then provides an amorphous standard for when a minor "is capable of meeting the informed consent standard[.]" *Id*.  It simply says that the minor will meet the standard if he or she "is able to comprehend the need for, the nature of, and any significant risks ordinarily inherent in the medical care." *Id*.  That section provides no objective measures and leaves the decision entirely up to the subjective analysis of the healthcare practitioner administering the vaccination.

Despite grounding the 2020 DC Law in the idea that a child could be capable of providing informed consent by being able to understand the nature and risks of vaccination like an adult, the D.C. Council did not think that the same child is capable of understanding the VIS prepared by the HHS for the vaccination.  Instead, it directed Defendant District of Columbia Department of Health to "produce one or more age-appropriate alternative vaccine information sheets" to provide to the child prior to vaccination and "to support providers for use in the informed consent process."  22-B DCMR § 600.9(c).

As reflected in the bill's summary, the final 2020 DC Law also requires the relevant medical professional, insurance provider, and school to engage in a series of subterfuges designed

14

to hide the vaccination from the child's parents.[11]  First, the healthcare professionals are required to seek reimbursement from an insurer without alerting the child's parent and the "[i]insurers shall not send an Explanation of Benefits for services," so that the parent will remain in the dark about the vaccination given to their child.  22-B DCMR § 600.9.  The health care provider is also required, when completing a health form for the parent to submit to the school, to deceive the parents by not including the vaccination given to the minor on the form.  *Id.*  Instead, to assure the ruse is complete, the health care provider is to provide a separate form to the school evidencing the receipt of the vaccine and the school is also required to hide the existence of this form and the fact the child was vaccinated from the parent.  *Id.*  In sum, the health care provider, the child, the insurance company, Defendant District of Columbia Department of Health, and the school will all be aware of the child's vaccination history – only the parent would be kept in the dark.

### III.    A Physician in the District of Columbia Sought to Vaccinate Plaintiff's Child Without His Consent

 Plaintiff is especially concerned about vaccinations for his daughter J.D. because she suffered a serious reaction to a tetanus, diphtheria, and pertussis-containing vaccine, when she was five years old.  *See* Declaration of Plaintiff Mazer, hereinafter "Mazer Dec.", at ¶ 4.  Immediately after these vaccinations, J.D. required urgent medical treatment, including a multi-day oral steroid pack to reduce the swelling and inflammation, and to assist with the severe pain she was experiencing.  *Id*. at ¶ 5.

Following this reaction, a pediatric allergy and immunology specialist wrote a medical exemption for J.D. from receiving any further doses of pertussis, diphtheria, and tetanus vaccination.  *Id*. at ¶ 6.  Plaintiff also has a sincerely held religious belief contrary to vaccination

---

[11] *See* https://code.dccouncil.us/dc/council/laws/23-193.html.

for J.D. since his religion prohibits him from permitting acts that he believes would harm his child. Plaintiff has therefore also submitted a religious exemption form to excuse J.D. from school vaccination requirements in more recent years. *Id.* at ¶ 7.

Nevertheless, on Friday, April 23, 2021, J.D., a child, visited a medical office, MedStar Georgetown Pediatrics, located in the District of Columbia without either of her parents or the consent of either of her parents. *Id.* at ¶ 8a.  J.D. brought with her a copy of her mother's insurance card.  *Id.* at ¶ 8b.  When she arrived, she presented her mother's insurance card, provided her birthdate, and informed them that her parents were not with her.  J.D. explained that she wanted to attend a summer camp and needed to receive a vaccine to do same and that her parents would not consent to her receiving this vaccine.  *Id.*

The receptionist did not have J.D. complete a consent form for the visit since J.D. was not of the age to be able to give consent and the 2020 DC Law did not require one (though federal law, as explained above, does). *Id.* at ¶ 8c.  A nurse then accompanied J.D. to a room where she was to be seen by Dr. Nneka Holder ("**Dr. Holder**")  When Dr. Holder arrived, she confirmed that J.D. was there without her parents' knowledge or consent in order to receive a Tdap vaccine.  Dr. Holder and the nurses at the MedStar Georgetown Pediatrics congratulated J.D. for sneaking behind her parents back to receive this medical product and also convinced J.D. to receive two other vaccine products, Gardasil and MenACWY.  So, even though J.D. went in to request one shot, she was then upsold to get three shots, and Dr. Holder told J.D. that she would need to get a booster of Gardasil in 6 to 12 months and would soon also need a shot of MenB.  *Id.* at ¶ 8d.

Dr. Holder further coached J.D. on lying in relation to receiving the shots.  After an hour and a half of complexity surrounding getting the shots without alerting her parents, the vaccines were finally brought into J.D.'s treating room.  J.D. became nervous upon seeing the shots and

voiced that she wanted to leave without getting the shots.  At that point, the doctor and nurse positioned themselves in the room such that she felt trapped.  After further dialogue and repeating that she no longer wanted the shots, J.D. was able to leave without getting the shots.  *Id*. at ¶ 8e.

During her lengthy visit, J.D. was told the vaccines are safe, nothing more.  She was not provided a VIS nor any other written information about these products.  At no time did anyone ask J.D. whether, for example, she had severe pain or swelling after a previous dose of any vaccine, nor any of the other medical conditions listed on the VIS that parents are told to inform their health care providers about before their child is vaccinated.  *Id*. at ¶ 8f.

Since J.D.'s last vaccines were at five years of age, she does not recall the specifics of the serious reaction she had nor to which vaccine she was given.  J.D. only recalls that she had a big, red arm. J.D. did not understand that her previous reaction was an allergic reaction.  She did not know it was from a tetanus, diphtheria and pertussis containing vaccine.  She also did not know that her prior reaction, to the extent she understood it might have been vaccine related, was something she needed to advise Dr. Holder about before being vaccinated with any vaccine.  Nor did Dr. Holder or the nurses seek to elicit this information from J.D. despite the fact that this was the first time they had ever met with her and had no information about her medical history.  *Id*. at ¶ 9.

## IV.    **Plaintiff is Extremely Concerned about his Daughter**

Plaintiff is a committed parent who, like most parents, carefully oversees the medical treatment of his children.  *Id*. at ¶ 10.  Plaintiff believes that he or his wife are aware of and have been present for all medical procedures performed on their children.  *Id*.  Likewise, Plaintiff and

his wife want to know and be present when their children undergo any medical procedure in the future, including receiving a vaccine. *Id.*

The 2020 DC Law prevents Plaintiff from knowing that his child has received any additional vaccinations and from being present during the procedure and decision-making process leading to that procedure. *Id.* at ¶ 11. Without knowledge that vaccines have been injected into his child, Plaintiff cannot properly manage her health care needs. It also prevents Plaintiff from receiving the VIS for the product that will be given to his child. Without the VIS, Plaintiff will not have an opportunity to inform the doctor of any precautions to vaccination listed on the VIS. *Id.* at ¶ 12.

For example, the VIS for Tdap provides that a parent is to advise a doctor if his child had "an allergic reaction after a previous dose" or "severe pain or swelling after a previous dose of any vaccine." https://www.cdc.gov/vaccines/hcp/vis/vis-statements/tdap.html. That is exactly what previously occurred to J.D. after a prior dose when she was five years-old, yet because Plaintiff was not present, he did not have an opportunity to inform Dr. Holder of this critical and important information, nor did the doctor ask J.D. about any prior swelling. Worse, MedStar Georgetown Pediatrics did ask about allergic reactions and J.D. said "none" apparently unaware that her prior reaction to a vaccine would be considered an allergic reaction. *See* Mazer Dec. at ¶ 13.

Under the regime established by the 2020 D.C. Law – created to lie to and deceive Plaintiff with regard to the medical care of his child – if J.D. had received the vaccine and had an adverse reaction, then Plaintiff would be unaware that the vaccine caused the reaction, and he will be seriously hindered in his ability to advocate for his child to obtain the needed medical care, nor will he know to obtain compensation for his child in the VICP. *Id.* at ¶ 14.

Plaintiff is extremely concerned that a doctor in the District of Columbia sought to vaccinate his daughter J.D. without his knowledge or consent, and was prepared to engage in an elaborate subterfuge, including counseling J.D. on how to lie, in order to conceal that the vaccine was given, and is concerned that one or more of his children may be, or have been, vaccinated without his consent or knowledge. *Id*. at ¶ 15. All of this occurred because of the 2020 DC Law.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 94 (D.D.C. 2012) (granting a preliminary injunction where the plaintiff asserted claims concerning his Fifth Amendment procedural due process rights against the District).

## I.    LIKELIHOOD OF SUCCESS ON THE MERITS

"While plaintiffs seeking a preliminary injunction have the burden of demonstrating likelihood of success on the merits, they are not required to prove their case in full at the preliminary injunction stage, but only such portions that enable them to obtain the injunctive relief that they seek." *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 118 (D.D.C. 2018). Plaintiff is likely to succeed at trial on his claim of federal preemption, his four claims pursuant to 42 U.S.C. § 1983 and his claims under the Religious Freedom Restoration Act.

### A.    The 2020 DC Law is Preempted by the 1986 Federal Act

A VIS is intended to provide parents with important information about the vaccines their children receive, and therefore, federal law mandates that medical practitioners who intend to

administer a vaccine to a child must give the VIS to the child's parent supplemented with appropriate additional information.  42 U.S.C. § 300aa-26.

The 2020 DC Law prohibits medical practitioners from fulfilling this legal obligation by prohibiting them from informing the parent regarding the vaccination of their child, or providing the parent a VIS prior to vaccination, if the practitioner is administering a vaccine to a child pursuant to the 2020 DC Law.  22-B DCMR § 600.9.  As such, it is impossible for a medical provider to comply with both the 1986 Federal Act and the 2020 DC Law.  Pursuant to the Supremacy Clause, the 2020 DC Law is preempted by the 1986 Federal Act.

Moreover, by prohibiting dissemination of a VIS to parents, the 2020 DC Law deprives parents of vital knowledge about the vaccine that the VIS requires parents receive before the vaccine is administered to their child.  Thus, the 2020 DC Law conflicts with both the wording of the 1986 Federal Act, codified at 42 U.S.C. § 300aa-26, and Congress's intent in passing this law.

The requirement to give the VIS to the parent is not only required by the 1986 Federal Law, giving a VIS to the parent of a child about to vaccinated is also just plain common sense.  Children are not legally competent to make their own medical decisions.  Issues such as vaccinations involve complex healthcare concerns, and are, therefore, expressly reserved for parents to make.  *See, e.g.,* 42 U.S.C. § 300aa-26.  Because parents are required to make these determinations, they must receive the vital information provided on the VIS prior to their children being vaccinated.  Instead, the 2020 DC Law, in violation of the 1986 Federal Act, permits a child to receive a vaccine without a parent to receiving the VIS thereby creating the untenable situation where the parents are expected to make decisions regarding their child's healthcare and any acute medical care needs, including vaccination needs, without vital information about their child's prior vaccination history. This could also lead to a child receiving unnecessary or duplicate vaccinations.

For the foregoing reasons, Plaintiff is likely to succeed on his first count that the 2020 DC Law is preempted by the 1986 Federal Act.

**B.      Plaintiff States Valid Section 1983 Claims Pursuant to the 5th Amendment**

"To succeed on a claim under 42 U.S.C. § 1983, a plaintiff must show that, while acting under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, the defendant deprived the plaintiff of "rights, privileges, or immunities secured by the Constitution and laws [of the United States]. 42 U.S.C. § 1983." *Parker v. District of Columbia*, 293 F. Supp. 3d 194, 200 (D.D.C. 2018).

Here, the Defendants are the CDPH, Laquandra S. Nesbitt, in her official capacity as the Director of the CDPH, and Muriel Bowser, in her official capacity as the Mayor of the District of Columbia, and they plainly act under the "color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia" when implementing and enforcing the 2020 DC Law.  Plaintiff, as the parent of J.D., has a constitutional fundamental liberty interest in the care, custody, control and management of his child, which includes the right to make decisions regarding J.D.'s medical treatment.  For the following reasons, the 2020 DC Law violates both Plaintiff's procedural and substantive due process rights as they relate to the fundamental liberty interest of the right to parent

**1.      Deprivation of Plaintiff's Rights and Privileges Under the 1986 Federal Act**

Defendants have deprived Plaintiff of his rights and privileges under the 1986 Federal Act. This federal law requires that medical practitioners who intend to administer a vaccine to a child must give the VIS to the child's parent supplemented with appropriate additional information prior to administering the vaccine.  42 U.S.C. § 300aa-26.  Defendants deprived Plaintiff of his rights and privileges under this federal law by enacting the 2020 DC Law which prohibits practitioners

from informing a parent regarding the vaccination of their child, or providing the parent a VIS, if the partitioner is administering a vaccine pursuant to the 2020 DC Law.  22-B DCMR § 600.9.  As such, the 2020 DC Law, on its face, deprives Plaintiff of the rights and privileges provided for under the 1986 Federal Act, including receipt of a VIS and the information contained therein prior to a vaccine being administered to his child in order to have an opportunity to address any of concerns raised in the VIS.

The facts in this case bring into sharp focus the harm that can result from depriving Plaintiff of this right under the 1986 Federal Law.  The VIS for Tdap provides that a parent is to advise a doctor if his child had "an allergic reaction after a previous dose" or "severe pain or swelling after a previous dose of any vaccine." (Ex. A at 19.)  That is exactly what previously occurred to Plaintiff's child after a prior dose when J.D. was five years-old but yet Plaintiff did not have an opportunity to inform the doctor of this critical and important information.  Nor did the doctor ask J.D. about any prior swelling.  Worse, they did ask about allergic reactions and J.D. said "none" apparently unaware that her prior reaction to a vaccine would be considered an allergic reaction. Under the regime created to lie to and deceive Plaintiff with regard to the medical care of his child, Plaintiff was deprived of his right and privilege to receive a VIS prior to his child receiving a Tdap and the ability to advocate for his child, including informing the doctor of critical information as instructed on the VIS and otherwise following the advice on the VIS on what to do if a serious reaction occurs and how to obtain compensation from the VICP.

For these reasons, Plaintiff is likely to succeed on in establishing that the 2020 DC Law deprives him of his rights and privileges provided for under the 1986 Federal Act, including receiving a VIS from the health care provider who intends to vaccinate his child prior to administration of the vaccine.

**2. Plaintiff Has a Fundamental Liberty Interest in the Right to Parent, including Participating in and Making Medical Decisions on Behalf of his Children**

"[T]he fundamental right of parents to make decisions concerning the care, custody, and control of their children" is possibly "the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). The Supreme Court has recognized this time and again. "This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to the companionship, care, custody, and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection." *Santosky v. Kramer*, 455 U.S. 745, 747, (1982) (internal citations omitted); *see also M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 119 (D.D.C. 2018) ("The Supreme Court has made clear that parents have a fundamental liberty interest in family integrity, and in the care, custody, and control of their children."); *In re T.J.*, 666 A.2d 1, 11-12 (D.C. 1995) ("The Supreme Court has recognized that natural parents have a fundamental liberty interest in the care, custody, and management of their children which is protected by the fourteenth amendment, and gives parents the freedom to make personal choices in matters of family life.").

"The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions" and, as a result, the courts recognize that parents are in a better position to make medical decisions for their child. *Parham v. J. R.*, 442 U.S. 584, 602 (1979).

A parent's right to control their child's medical care includes the authority to control the medication that their children receive. "[A] surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages. In the case of a minor patient, the relevant consent is that of the parents." *Kozup v. Georgetown Univ.*, 271 U.S. App.

23

D.C. 182, 851 F.2d 437, 439 (1988) (declining to grant summary judgement in favor of the hospital on the parents' battery claim when the hospital failed to obtain the consent of the parents before giving the child blood transfusions that eventually proved to be contaminated with the HPV virus.)

Likewise, "[i]t is a basic principle that parents have a due process right to make decisions concerning the care, custody, and control of their children."  *In re A.G.*, 900 A.2d 677, 680 (D.C. 2006) (internal quotation marks and citations omitted). The Supreme Court has made clear that this "fundamental liberty interest of natural parents . . . does not evaporate" even if "they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re G.K.*, 993 A.2d 558, 568 (D.C. 2010) (holding that the DC Child and Family Services Agency had no authority to consent that the child in their custody be given psychotropic medication; the right to consent belongs only to the parents).

Here, there is no question that Plaintiff is J.D.'s natural parent.  Therefore, under the foregoing precedent, Plaintiff has a fundamental right to control J.D.'s medical care.  At no time has Plaintiff ever had this right suspended, taken away, or in any other way limited.  This right was firmly in place when J.D. entered MedStar Georgetown Pediatrics and Plaintiff is likely to succeed on this second count.

### 3.   **The 2020 DC Law Violates Plaintiff's Procedural Due Process Rights**

"There is a presumption that fit parents act in their children's best interests, . . . there is normally no reason for the State to inject itself into the private realm of the family to further question fit parents' ability to make the best decisions regarding their children." *Troxel*, 530 U.S. at 58.  Therefore, under the Fifth Amendment, before parents may be deprived of the custody "of their children without their consent, due process — ordinarily a court proceeding resulting in an

order permitting removal — must be accorded to them." *Doe v. District of Columbia*, 418 U.S. App. D.C. 96, 103, 796 F.3d 96, 103 (2015).

Due process requires that the state may only conduct or authorize medical procedures on a child without parental permission if either it receives a court order, or if it can show that emergency circumstances required the medical procedure. *Id.*

The 2020 DC Law provides for no due process whatsoever. The DC 2020 Law is in effect the state authorizing medical procedures on children without parental consent. It completely shifts the decision as to whether to administer a vaccine from the parent to the medical provider. The 2020 DC Law expressly excludes the parent from any role in the decision or from ever finding out that the vaccination even occurred. 22-B DCMR § 600.9. The 2020 DC Law does not require any pre-vaccination judicial intervention. Similarly, it does not allow for any post-vaccination process by which parents can petition to learn about the vaccination.[12] As a result, the 2020 DC Law deprives Plaintiff of his right to participate in the decision of whether to vaccinate J.D., and the 2020 DC Law provides Plaintiff with no way to learn about the vaccination after the fact. By depriving Plaintiff of this knowledge, it not only impacted his decision regarding the vaccination, but also could impact other medical decisions. For example, there are certain medications that a person should not take if they have recently been administered a vaccine, including receiving certain additional vaccines, and there are certain timely and critical steps to take in the event of a reaction. (*See, e.g.,* Ex. I at 2.)

---

[12] Given that there is no way to reverse a vaccination, a post-deprivation procedure whereby a parent could petition the court would be insufficient to safeguard the parents' rights in this situation. Nevertheless, it does not even provide the basic protection of such a post-deprivation procedure for a parent to learn about the vaccination.

The 2020 DC Law also does not attempt to guide or limit medical providers as to when it is appropriate to circumvent parental decision making nor does it limit which medical providers can choose to administer the vaccination.  22-B DCMR § 600.9.  As such, any medical provider who is licensed to administer vaccines in the District of Columbia can vaccinate any child that comes to the medical provider's District of Columbia office from anywhere in the world if the medical provider feels it is appropriate, regardless of the fitness, circumstances or desire of the parent.

Furthermore, that child could be vaccinated at school without the parent's knowledge.  (*See* Ex. J at 2).  (The D.C. Government webpage regarding School Based Health Centers (SBHC) which explains that, "there are seven (7) SBHC's in the District of Columbia that the DC Department of Health oversees" and that a "SBHC can serve as a student's primary health care provider or supplement the services they would normally receive [including] … Immunizations.").)  As a result, it is possible that any child eleven years or older can receive any of over two dozen vaccines licensed for children ages eleven to eighteen years of age at school and the parent would have no way of knowing whether their child has received one or more of these vaccines.  (Ex. K.)

Thus, the 2020 DC Law permits medical practitioners to unilaterally deprive Plaintiff of his right to make informed medical decisions for current and future medical care for J.D.  The 2020 DC Law deprives parents of this right without any due process whatsoever and, as such, Plaintiff is likely to succeed on his claim for violation of his due process rights.  *Cf. In re G.K.*, 993 A.2d at 568 (holding that the DC Child and Family Services Agency had no authority to consent that the child in their custody be given psychotropic medication; the right to consent belongs only to the parents). Plaintiff is likely to succeed on his third count.

4.  **The 2020 DC Law Violates Plaintiff's Substantive Due Process Rights**

As to the District of Columbia, liberty rights are protected by the Fifth Amendment's Due Process Clause. *See Bolling v. Sharpe*, 347 U.S. 497. The Fifth Amendments due process clause "guarantees more than fair process" and "includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel*, 530 U.S. at 65. The due process clause of the Fourteenth and Fifth Amendments "forbids the government to infringe . . . fundamental liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotations omitted). The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *M.G.U. v. Nielson*, 325 F. Supp. 3d 111, 120 (D.D.C. 2018) quoting *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d at 702 (D.C. Cir. 2007).

As noted, parents like Plaintiff have a fundamental liberty interest in the care, custody and control of their children. *Id*. at 119. This includes the right to make medical decisions regarding their children. There is no legal precedent that would support any claim by Defendants that they have a compelling interest in depriving all parents with children age eleven and older of their right to make medical decisions regarding vaccinations and then preventing those same parents from knowing their children's vaccination history.

Assuming *arguendo* Defendants could show it has a compelling interest to hide vaccination information, which it cannot, the 2020 DC Law is not narrowly tailored. It applies blindly to all parents of children in the District of Columbia and to parents who live outside the District of Columbia whose children age eleven or older seek to be vaccinated under the 2020 DC Law, regardless of their fitness. That is why Plaintiff ended up in his current situation wherein he was

deprived of his right to participate in the decision whether to vaccinate his daughter, and now cannot be certain at any moment in time as to which vaccines J.D. have received.  This is particularly concerning with regard to J.D. who has suffered a serious reaction to a prior vaccine and is a high risk of injury from another dose.  By indiscriminately applying the same rule to all parents, Defendants failed to act in a narrowly tailored manner and thereby violated Plaintiff's fundamental rights.

The 2020 DC Law's express scheme, involving the doctor, insurer, school and health department, to all act in concern to lie too and deceive the child's parents is a shocking violation of substantive due process.  *See Am. Acad. of Pediatrics v. Heckler*, 561 F. Supp. 395 (D.D.C.1983) (holding that an HHS regulation aimed at eliminating the parents' right to decide the medical treatment their child should receive was invalid and noting that such regulation infringes upon the constitutional right of parents to decide the medical care of their children as outlined in Supreme Court precedents.) Plaintiff is likely to success on his fourth count.

### 5. <u>The 2020 DC Law Violates Plaintiff's Sincerely Held Religious Beliefs Pursuant to RFRA and the First Amendment</u>

By placing an unwarranted substantial burden on Plaintiff's religious practices, Plaintiff is likely to establish that the 2020 D.C. Law not only violates the Free Exercise Clause of the First Amendment, but it also violates the Religious Freedom Restoration Act ("RFRA"), codified at 42 U.S.C. § 2000bb–1.  RFRA applies to the District of Columbia, 42 U.S.C. § 2000bb–2, and to establish a violation of RFRA, Plaintiff needs to "first show a substantial burden on its religious exercise." *Capitol Hill Baptist Church v Bowser*, 496 F. Supp. 3d 284, 293 (D.D.C. 2020).  Once that is established, "the onus then shifts to the government to show that the law or regulation at issue is the least restrictive means to further a compelling interest." *Id.*  "A 'substantial burden' exists when government action rises above *de minimis* inconveniences and puts substantial

pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* at 294 (internal quotations omitted).

Plaintiff holds sincere and genuine religious beliefs that prohibit him from vaccinating his children if he believes that a potential vaccination may be harmful to them. Due to these beliefs and following J.D.'s adverse reaction to previous vaccinations, Plaintiff had requested and received a religious exemption to excuse J.D. from school vaccination requirements in recent years. Plaintiff is a competent parent, able to make decisions based on the best interest of his child and has concluded that the risks of injecting J.D. with certain vaccines outweigh any potential benefit and could cause J.D. harm therefore, his religious beliefs prevent him from consenting. J.D., a child, has not yet fully and independently established a core set of religious beliefs and has been brought up to believe what her parents believe. Until she reaches the age of majority and is competent to make her own religious decisions, Plaintiff's sincerely held religious beliefs must dictate and limit J.D.'s conduct. Any healthcare practitioner that injects J.D. against Plaintiff's wishes and beliefs substantially burdens Plaintiff's right to practice his religion as he sees fit because it will place far more than a *de minimis* inconvenience on him, it will entirely take away this right. See *Wisconsin v. Yoder*, 406 U.S. 205, 233, (1972) (holding that parents have the right to "direct the religious upbringing of their children" and that "when the interests of parenthood are combined with a free exercise claim […] more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment.")

Furthermore, given that the 2020 DC Law indiscriminately deprives Plaintiff, and all other parents in the District of Columbia with children ages eleven through eighteen, and parents whose children ages eleven through eighteen make their way into the District of Columbia, of their right

to make similar religious decisions for their children, Defendants will be unable to establish that the law is the least restrictive means of achieving a compelling government interest (assuming one even exists).

## II.   IRREPARABLE HARM

Plaintiff will sustain an irreparable injury that cannot be remedied by an award of monetary damages in absence of the injunction.  "The loss of constitutional freedoms…unquestionably constitutes irreparable injury."  *Mills v. District of Columbia*, 387 U.S. App. D.C. 221, 229, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (granting a preliminary injunction against the district upon the plaintiffs' assertion of their Fourth Amendment rights) (internal citations omitted).  Likewise, the violation of RFRA itself establishes an irreparable injury.  *Capitol Hill Baptist Church*, 496 F Supp 3d at 301 ("The conclusion that the Church is likely to succeed on the merits of its RFRA claim therefore also suffices to show that the Church will be irreparably harmed without injunctive relief.")  Thus, the Defendants interferences with a parent's fundamental liberty interest in caring for their child will create an irreparable injury to the parent and the child.

A vaccine injection cannot be undone, and even if the vaccine itself does not end up irreparably harming J.D., the parental rights of Plaintiff will be irreparably harmed.  Plaintiff's rights to receive a VIS and take appropriate precautions prior to and after their child is injected with a vaccine cannot be recreated or handled after the fact.  Plaintiff's right to receive additional visual and oral information from the health care provider prior to administering a vaccine cannot be recreated.  While Plaintiff ultimately learned of J.D.'s visit to MedStar Georgetown Pediatrics and her intention to request at least one vaccine, and discussed the issue with her, based on that discussion, they have reason to believe that J.D. has not abandoned her intention to do so again.  J.D. is sixteen and is more than capable of circumventing her parents to go to the District of

Columbia and request one or more vaccinations. And, for their part, there is no doubt that Dr. Holder and other medical personnel would be willing to administer vaccines to J.D. again, pursuant to the 2020 D.C. Law.  The 2020 DC Law has been enforced against the interests of Plaintiff before, and, thus, there is a credible and real threat that it will be enforced against his interests in the future as well.

There is a credible basis to believe J.D. who was already successful at obtaining an appointment with a medical provider to request to receive a vaccine without her parents' consent or knowledge under the 2020 DC Law, will visit a medical provider in the District of Columbia and request to be vaccinated again.  Plaintiff reasonably and credibly fears that J.D. may at any time either return to the same medical practice or visit another medical practice in the District of Columbia where she may then request to receive one or more vaccinations without Plaintiff's consent or knowledge. *See* Mazer Dec. at ¶ 16.  The deprivation of these rights has no adequate remedy at law and constitute irreparable injury.

Defendants continued encouragement and permission to health care providers to administer vaccines without parental consent or knowledge threatens to deprive Plaintiff of the foregoing rights.  Plaintiff's children could be injected with a vaccine without the Plaintiff's consent or knowledge.  This is the precise intent of Defendants' promulgation and promotion of the 2020 DC Law.

In addition to the deprivation of the foregoing constitutionally protected rights, without knowledge that this medical procedure has been performed on their child, Plaintiff will not be in a position: (1) to decide whether to avoid or delay this procedure - as suggested for some people on the VIS and the Product Insert for each vaccine; (2) to look for adverse reactions, which are listed

on the VIS and the Product Insert for each vaccine; or (3) to file a claim in the VICP for any injury resulting from the vaccine product(s) injected into their child.

## III.    BALANCE OF THE EQUITIES AND PUBLIC INTEREST

"When the government is a party to the suit, the final factors to be considered in granting a preliminary injunction—the balance of the equities and the public interest—'are one and the same, because the government's interest is the public interest.'" *Costa v. Bazron*, 464 F. Supp. 3d 132, 156 (D.D.C. 2020) (quoting *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511, 425 U.S. App. D.C. 31 (D.C. Cir. 2016)).  In considering whether to grant a preliminary injunction, the Court must 'balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief.'" *Nielson*, 325 F. Supp. 3d 111, 123 (D.D.C. 2018) (quoting *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014)).  Here, the equities weigh decidedly in favor of granting Plaintiff's preliminary injunction.  Absent a preliminary injunction, Plaintiff is harmed by the Defendants' actions and the 2020 DC Law because his fundamental liberty right to parent will be curtailed.

In contrast, the preliminary injunction sought by Plaintiff would still permit every child in the District of Columbia and everywhere else to be administered vaccines with the consent of their parents as provided in the 1986 Federal Law.  Further, Defendants will still be permitted to promote use of the vaccines, as they did for years prior to enactment of the 2020 DC Law.  The preliminary injunction would merely provide increased assurance that Plaintiffs' fundamental rights are preserved during the pendency of this action by enjoining Defendants from allowing medical providers to administer vaccines to a child without such medical provider first providing the child's parent a VIS supplemented with any appropriate visual presentations or oral explanations, and consent of the parents, as required by the 1986 Federal Act.  Thus, Defendants will only be

precluded from allowing violation of the 1986 Federal Law and Plaintiff's constitutional rights. In fact, it is Plaintiff's proposed injunction that serves the public interest, because "enforcement of an unconstitutional law is always contrary to the public interest." *Karem v. Trump*, 447 U.S. App. D.C. 103, 115, 960 F.3d 656, 668 (2020) (citing *Gordon v. Holder*, 406 U.S. App. D.C. 6, 721 F.3d 638 (2013)); *see also Costa*, 464 F. Supp. 3d at 157 (D.D.C. 2020) ("it is always in the public interest to vindicate constitutional rights"). As shown, promoting and enforcing the 2020 DC Law violates federal law and is unconstitutional because it violates the Supremacy Clause and the First and Fifth Amendments.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court enter a preliminary injunction in the form requested.

Dated: July 7, 2021

<div style="margin-left: 2em">

SIRI & GLIMSTAD LLP


/s/ Aaron Siri
Aaron Siri, Esq. (*pro hac vice* to be submitted)
Elizabeth Brehm, Esq. (*pro hac vice* to be submitted)
Caroline Tucker, Esq. (*pro hac vice* to be submitted)
200 Park Avenue
17th Floor
New York, New York 10166
Tel: (212) 532-1091
aaron@sirillp.com
ebrehm@sirillp.com
ctucker@sirillp.com


/s/ Christopher Wiest
Christopher Wiest (*pro hac vice* to be submitted)
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
Tel: (513) 257-1895
chris@cwiestlaw.com

</div>

/s/ John R. Garza
John R. Garza
Bar ID: 398728
Garza Building
17 W. Jefferson Street, Suite 100
Rockville, Maryland 20850
Tel: (301) 340 8200 x 100
jgarza@garzanet.com

*Attorneys for Plaintiff*